**JAMIE ELIZABETH SCHMID**
California State Bar No. 339135
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666

Attorneys for
Jonathan Bodine Bonyhard

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>JONATHAN BODINE BONYHARD,<br><br>     Defendant. | CASE NO.:  25-CR-01227-BTM<br><br>Hon. Barry Ted Moskowitz<br>*Evidentiary Hearing*<br>Date: June 26, 2025<br>Time: 1:30 p.m.<br><br>**Mr. Bonyhard's Motion to Suppress Statements** |

Mr. Bonyhard respectfully submits this motion to suppress his post-arrest statements in violation of *Miranda* and the Due Process Clause of the Fifth Amendment.

## I.   Introduction and Statement of Facts

On February  26, 2025, at around 2:36 a.m., Mr. Bonyhard attempted to cross into the United States at the San Ysidro Port of Entry. CBP Officers sent Mr. Bonyhard to secondary inspection after a dog alerted to his car. During secondary inspection, officers found approximately 109 packages of methamphetamine (about 70 kilograms) concealed in his car.

At around 2:36 a.m., Mr. Bonyhard was handcuffed and placed in a processing area while two officers patted him down. *Exhibit A* ("Declaration").  In that time, Mr. Bonyhard requested that he be able to call his attorney. *Id.* The officers said that he

could not make any calls at that time. *Id.* Mr. Bonyhard was then led to metal benches in the middle of the room. *Id.* He was cuffed to the bench. *Id.* In that area he again asked to call his attorney. *Id.* He was told by an officer that he could not make any calls, and that an attorney would be provided for him. *Id.* Around two hours later, another officer entered the room and told Mr. Bonyhard he was officially under arrest. *Id.* Mr. Bonyhard for the third time asked to call an attorney. *Id.* However, his request was ignored. *Id.* Mr. Bonyhard fell asleep shackled to the bench for an indeterminate amount of time. *Id.* Mr. Bonyhard woke up when two officers unshackled him and led him to an interrogation room. *Id.* Mr. Bonyhard was extremely disoriented. *Id.*

At around 6:56 a.m., Mr. Bonyhard is taken into an interrogation room and advised of his *Miranda* rights. *Exhibit B* at 14:30. At that point, Mr. Bonyhard believed the government wouldn't be providing him an attorney since he had asked to call his attorney three times. *Exhibit A*. Mr. Bonyhard initials the advisal form after being told each right. Agents then tell Mr. Bonyhard to read the last line out loud on the *Miranda* advisal form. *Id.* at 15:35.

> "I have read, or someone has read to me a statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."

Immediately after reading this, Mr. Bonyhard asks the agent to strike the last line of the statement. *Id.* at 15:44 ("If we could strike that last line, that would be great"). The agent responds, "well that is kind of a big line" and asks if he is willing to answer questions without a lawyer present. *Id.* at 15:50. Mr. Bonyhard hesitates and then states, "to a degree yes." *Id.* The officer explains that they can stop the interrogation at any time, and he doesn't have to answer every question. *Id.* at 16:00. Mr. Bonyhard then states that "there really isn't anything to say because I am fucked." *Id.* at 16:45. The agent then states that they would ask Mr. Bonyhard questions about what happened and that little details may be important to them. *Id.* at 16:50. Mr. Bonyhard then starts to say that he thinks he knows who did this to him and when. *Id.*

at 17:11. The agent cuts him off. Then Mr. Bonyhard states it is alright, "I will fuck myself" and asks, "do you want me to sign it?" *Id.* at 17:20. When asked if he wants to sign and waive his right to an attorney again, Mr. Bonyhard signs and says something inaudible. *Id.* at 17:43.

Mr. Bonyhard begins by stating that "there is a degree to which I could be more forthcoming with you, but it could be dangerous." *Id.* at 18:22. Mr. Bonyhard then goes into his narrative of what happened that evening. He explains how he was at the casino with his girlfriend Evelyn. He explained that he goes to Mexico multiple times a week to see her and hang out. *Id.* at 19:30. He tells the agent that they parked the car in a valet at the casino, and that they were at the casino for 3-4 hours. *Id.* at 30:00. Mr. Bonyhard states that he didn't notice anything unusual and expresses confusion about when this could have happened. *Id.*

Mr. Bonyhard expresses that he believes the person who may have done this was "Chino" (cousin of Evelyn) because he is involved with drugs. *Id.* at 32:10. Mr. Bonyhard states that he doesn't know exactly what Chino does or who he does it for. *Id.* at 33:30. Mr. Bonyhard states that he doesn't have Chino's number. *Id.* at 43:20.

Around 48 minutes into the interrogation, the agent recaps Mr. Bonyhard's statements so far and then tells him that it is a crime to lie to federal officers. *Id.* at 48:00. Mr. Bonyhard states that "there are things I am not telling you, but I am not telling you anything that isn't true. I am just not saying some things that are." *Id.* at 49:23. Mr. Bonyhard states that on previous occasions (3-4 months ago) he has been asked to bring things into the United States by Chino. *Id.* at 50:00. Mr. Bonyhard reiterates that he didn't know there were drugs in his car. *Id.* at 51:00. Mr. Bonyhard continues to state that he is didn't know they were drugs in the car, but he knows he is to blame because he was the one who drove the car. *Id.* at 55:00.

Around one hour and five minutes into the interrogation, the agent again states that he is struggling to believe Mr. Bonyhard's story because of the way the drugs were concealed in the amount of time at the casino. *Id.* at 1:05:00-1:06:30. The agent again

MR. BONYHARD'S MOTION TO SUPPRESS STATEMENTS

asks, "is there something else you are not telling me?" *Id.* at 1:06:48. Mr. Bonyhard states frankly, "yes there are lots of things I am not telling you." *Id.* Mr. Bonyhard states that "I don't want things worse than this to happen to me potentially." *Id.* at 1:07:00. Mr. Bonyhard explains that he has his "interest to protect" and that he does not want "to get harmed." Id. at 1:07:20. He further explains that "I don't want bad shit to happen to me." *Id.* at 1:07:49.

At this moment, the following exchange takes place:

**Agent:**     **"I understand and what you tell me isn't going anywhere…between…other than…you trained as a paralegal right? You know I am not going to go tell…"**

Bonyhard     "Nothing about my training as a paralegal lead me to believe that investigators have some special duty to keep me safe. Nothing. I do have a special duty to keep me safe, so I am proceeding slowly"

**Agent:**     **"Look, I'm telling you. I don't want anything to happen to you and I am not going to provide sensitive information to anybody. I don't want anybody getting harmed. Period."**

In response to this promise, Mr. Bonyhard states that he understands that, and he starts asking the agents about how the drugs were going to get out of his care. The interrogation continues with much of the same. However, towards the end of the interrogation, Mr. Bonyhard makes statements that he has been up to Riverside before and that he knows "where they take it out of the cars there." *Exhibit C.* He also states that he knows one of three places that Chino uses in Riverside/Los Angeles, and that Mr. Bonyhard has driven things before. *Id.* Specifically, Mr. Bonyhard states that he has driven drugs in the past in the Los Angeles/Riverside area, but never across the border. *Id.* Mr. Bonyhard made these statements because he believed this information wouldn't leave the interrogation room. *Exhibit A.*

Mr. Bonyhard is now filing this motion to suppress his statements. First, Mr. Bonyhard invoked his right to counsel while in the security office before his

interrogation. At that point, the government violated Mr. Bonyhard's clear invocation by taking him into an interrogation room and trying to interview him. Once an individual invokes their right to counsel, any attempt at interrogation must immediately stop until an attorney is present. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Therefore, his statements be suppressed as violation of *Miranda.*

Second, assuming a valid waiver, Agent Maclean eviscerated Mr. Bonyhard's Miranda waiver when he stated that Mr. Bonyhard's statements aren't "going anywhere" and that the sensitive information he provides is not going to "anybody." These promises also made Mr. Bonyhard's subsequent statements involuntary. As such, his statements made after Agent Mclean's promises must be suppressed as fruits as an illegal Miranda violation and as involuntary.

## II.    Argument
### A. Motion to Suppress Statements
#### a. **Mr. Bonyhard invoked his right to counsel, and the government violated his invocation by initiating interrogation.**

If a person "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning." *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). A defendant subject to a custodial interrogation must invoke her Fifth Amendment right to counsel clearly and unambiguously. *Davis v. United States*, 512 U.S. 452, 459 (1994). Once an individual invokes their right to counsel, the interrogation must immediately stop until an attorney is present. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Additionally, "[a] request for counsel need not be stated as a model of eloquence and clarity in order to qualify as an unequivocal invocation of the right to counsel. *See Davis* at 459. An unequivocal invocation can contain an "um" and a "well" and still be understood to an ordinary person to be an invocation of their right to counsel.

//
//

5                                                    **25-CR-01227-BTM**
MR. BONYHARD'S MOTION TO SUPPRESS STATEMENTS

Before interrogation, Mr. Bonyhard asked multiple times if he could call his attorney. *Exhibit A.* He was ignored and told that an attorney would be provided for him later. *Id.* Mr. Bonyhard knew he was in trouble and that police interrogation was imminent. *Id.* His statement of "Can I call my lawyer" was a clear invocation of his right to counsel, and the agents in this case should not have taken Mr. Bonyhard to an interrogation room without the presence of his lawyer or unless Mr. Bonyhard reinitiated conversation with the agents.

Furthermore, Mr. Bonyhard's later interactions with the agent strengthens the fact that this invocation was unambiguous. *United States v. Escobedo-Gomez,* 715 F. App'x 743, 744-45 (9th Cir. 2018). Here, Mr. Bonyhard said that he wanted to "strike the last line" of the *Miranda* advisal form – expressing his continued request for counsel. *Exhibit B* at 15:44. He also expressed fear of saying anything because he was "fucked." *Id.* As eloquently described in *Sessoms,* the answer to "[a]nd at this point, eh, like, can I say that I need a lawyer or" was easy. *Sessoms v. Grounds,* 776 F 3d. 615, 626 (9th Cir. 2015). All officers had to say was "yes, you have the right to remain silent and you have the right to a lawyer even if you can't afford one." *Id.* At that point, the interrogation should have ceased. Instead, the agent ignored Mr. Bonyhard's multiple requests.

As in *Sessoms,* the agents in the security office "instead pretended" that Mr. Bonyhard "had never raised the issue of a lawyer in the first place." *Id.* All the CBP officers had to say was "yes, you can get an attorney now" or "you can call an attorney now." See *Alvarez v. Gomez,* 185 F.3d 995, 998 (9th Cir. 1999), *as amended* (Sept. 2, 1999) (explaining the only thing the officer had to say to Mr. Alvarez's unambiguous questions was a "simple unambiguous 'yes'").

Given that Mr. Bonyhard unambiguously invoked his right to counsel, the agents should not have proceeded with their interrogation. Therefore, his statements must be suppressed.

### b. Mr. Bonyhard's statements must be suppressed as the agent's promise that his statements wouldn't go anywhere caused his previous *Miranda* waiver to be void.

Even if this Court finds that Mr. Bonyhard's requests for counsel were not unambiguous, Mr. Bonyhard's statement should separately be suppressed due to the promises that the agent made to Mr. Bonyhard.

The Supreme Court created *Miranda* warnings to serve as a procedural safeguard to protect an individual's Fifth Amendment rights while in custody. *Miranda v. Arizona*, 384 U.S. 436 (1966). One of the rights that must be stated by officers to the individual in custody is an "explanation that anything said can and will be used against the individual in court." *Id.* at 469. The Supreme Court explained that "[t]his warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it." *Id.* And while an individual may waive his rights at the beginning of the interview, this waiver can later be invalidated by the actions and words of interrogating agents. The *Miranda* Court recognized that a waiver of the rights afforded by the warnings can be undermined by words or actions on the part of the police. *Miranda,* 384 U.S. at 476. *See also Colorado v. Spring,* 479 U.S. 564, 576 n. 8 (1987) (noting that the Court "has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege" (citation omitted)); *Doody v. Ryan*, 649 F.3d 986, 1003 (9th Cir. 2011) (en banc) (finding that the agent misinformed the defendant as to his *Miranda* rights when he gave unclear, confusing and improperly qualified follow-up explanation).

For example, an agent cannot out of one side of his mouth state that everything (1) Mr. Bonyhard says will be used against him, and then out of another side of his mouth state that (2) sensitive information won't be provided to anyone and that what Mr. Bonyhard states "isn't going anywhere." And while this may be common sense, the Ninth Circuit has yet to publish a decision exactly on point. However, this Court can look to the Fifth Circuit's decision in *Hopkins v. Cockrell* for guidance. 325 F.3d 579 (5th Cir. 2003). In Hopkins, the Fifth Circuit held that "[a]n officer cannot read the

defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant." *Id.* at 585. *Hopkins* held that even though the defendant waived his *Miranda* rights, the officer's subsequent statement confidentiality *subverted* the earlier warnings and waiver. *Id.*

And although not directly addressing *Miranda* (because the defendant was not in custody), the Third Circuit in *Walton* held that "there was no reason for Walton to disbelieve [the officer] that nothing he said would be used against him, and to rely instead upon the [previous] *Miranda* warnings." *United States v. Walton,* 10 F.3d 1024, 1030 (3d Cir. 1993). The Court noted that the *Miranda* warning and then the officer's "off the cuff" promise were "inconsistent" with each other. *Id.* Therefore, the assurances from the officer that the conversation would be "off the cuff" "created a situation in which Walton was deprived of the ability to understand the consequences of foregoing his privilege.*" Id.* See also *United States v. Lall,* 607 F.3d 1277, 1287 (11th Cir. 2010) (holding that the promise that Lall's statements would not be used against him completely undermined the prophylactic effect of the Miranda warnings previously administered").

A mountain of state court cases holds the same. *See State v. Stanga*, 617 N.W.2d 486, 490 (S.D. 2000) (holding that the trial court erred in not suppressing statements made after the officer made insinuation of an off-the-record conversation—violating the previous *Miranda* waiver); *Lee v. State*, 12 A.3d 1238, 1251 (Md. 2011) (holding that the detectives "affirmative misrepresentation mid-way through the interrogation that Petitioner's statements were "just between you and me, bud. Only you and me are in here," rendered Petitioner's prior *Miranda* waiver ineffective for all purposes); *Spence v. State,* 642 S.E.2d 856, 858 (Ga. 2007) (holding that statements were inadmissible after agent told defendant that the interrogation was confidential even after a valid *Miranda* waver); *State v. Pillar*, 850 A.2d 1, 8 (N.J. Super. Ct. App. Div. 2003) ("An acquiescence to hear an "off-the-record" statement from a suspect, which the officer ought to know

cannot be "off-the-record," totally undermines and eviscerates the *Miranda* warnings[.]").

Here, the agent's promise that everything said would stay in the room completely eviscerated the agent's previous *Miranda* advisal.  Mr. Bonyhard's previous *Miranda* waiver could not have been valid due to the subsequent promise by the agent. In a declaration signed under the penalty of perjury, Mr. Bonyhard stated that he believed everything he said would stay with the agent and never be heard again. *Exhibit A.* There is no way in which Mr. Bonyhard could understand the consequences of the *Miranda* warnings if the agent could so easily contradict them himself in another breath. Thus, the agent's statement of confidentiality and explicit promise of secrecy corrupted the previous *Miranda* warning given to Mr. Bonyhard, and therefore his statements must be suppressed under *Miranda* and cannot be used in the government's case-in-chief.

> **c. Mr. Bonyhard's statements must be suppressed as the agent's promise that his statements wouldn't go anywhere and that sensitive information would not be provided to anyone made Mr. Bonyhard's subsequent statements involuntary.**

Separate from the *Miranda* violation, Mr. Bonyhard's statements are also suppressible under a separate voluntariness analysis. Prior to the agent's promises that (1) what Mr. Bonyhard said wasn't going anywhere, and that (2) sensitive information wouldn't be provided to anyone, Mr. Bonyhard *did not* make statements about previous times driving drugs in Los Angeles, information about alien smuggling, or knowing where drugs are dropped off in Los Angeles.

But this all changed when the agent explicitly promised Mr. Bonyhard that everything he said would stay within the four corners of the interrogation room. Only after these statements did Mr. Bonyhard make statements related to drug trafficking and alien smuggling. These two promises by the agent, along with the CBP officer's previous denial of Mr. Bonyhard's requests for counsel, was sufficient enough to

render his statements involuntary. The government bears the burden to demonstrate that a confession is voluntary. *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988).

An accused's confession must result from an "independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Martin v. Wainwright,* 770 F. 2d 918, 924 (11th Cir. 1985), modified, 781 F. 2d 185 (11th Cir.) (quotations omitted). To be considered voluntary, a statement must be the product of rational intellect and a free will. *Blackburn v. Alabama,* 361 U.S. 199, 208 (1960). The test for the voluntariness of a confession "is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence. *Bram v. United States,* 168 U.S. 532, 542–43 (1897).

Although there is not a Ninth Circuit case on point, other circuits have found time and time again that promising a defendant that their statements will stay within an interrogation room clearly renders the resulting statements involuntary.

For example, in *Streetman v. Lynaugh* the Fifth Circuit explained that "certain promises, if not kept, are so attractive that they render a resulting confession involuntary," and that "[a] promise ... that any statement will not be used against the accused is such a promise." *Streetman v. Lynaugh,* 812 F.2d 950, 957 (5th Cir. 1987) (overruled on other grounds). In *Lall,* the Eleventh Circuit also held that a promise to not use any statements against the defendant rendered his subsequent statements involuntary. *Lall,* 607 F.3d at 1277; *See also United States v. Rutledge* 900 F.2d 1127, 1129 (7th Cir. 1990) (explaining that "[i]f the officers, fully intending to use anything Rutledge said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you,' then he would have a strong argument that any ensuing confession had been extracted by fraud and was involuntary"; *Hopkins v. Cockrell,* 325 F.3d 579, 584 (5th Cir. 2003) (holding that

MR. BONYHARD'S MOTION TO SUPPRESS STATEMENTS

the promise that the defendant's statement would stay only between the agent and the defendant made the defendant's resulting statement's involuntary).

Therefore, the promise not to use a suspect's statement against the suspect is a "uniquely influential" promise and "may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." *United States v. Walton,* 10 F.3d 1024, 1030 (3d Cir. 1993). And the reasoning of these federal courts make sense. After all, a promise not to use one's statements goes to the very heart of one's ability to make a rational choice and for self-determination. *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973).

Though the Ninth Circuit has not adopted a brightline rule that a false promise to keep statements confidential render subsequent statements involuntary, these promises are still considered strong indicators of involuntary statements under the totality of the circumstances.

For example, in *United States v. Preston*, the court held that the defendant's statements in response to police's false promise to keep his confession confidential were involuntarily given. In that case, the interrogating agents told the defendant that they would not tell anyone what he said and that the defendant's statements would not leave the U.S. Attorney's Office or their "folder." 751 F.3d 1008, 1026 (9th Cir. 2014). The court found that this implied the defendant's statements would not be used against him and was exactly the type of "extrinsic consideration" likely to "'distort[ ] an otherwise rational choice of whether to confess or remain silent.'" *Id.* at 1027 (quoting *Holland v. McGinnis,* 963 F.2d 1044, 1051–52 (7th Cir.1992)). In *Henry v. Kernan*, the court came to a similar conclusion about statements obtained by an officer's promise that "what you say can't be used against you right now." 197 F.3d 1021, 1027 (9th Cir. 1999). That court held that the officer's false promise of confidentiality was "deliberately designed to undermine Henry's ability to control the time at which the questioning occurred, the subjects discussed, and the duration of the interrogation," rendering the resulting statements involuntary and inadmissible. *Id.*

The interrogating agent's statements to Mr. Bonyhard in the instant case are alarmingly similar to those in Preston and Henry. The agent's statements that "what you tell me isn't going anywhere" and "I am not going to provide sensitive information to anybody" are clearly the type of "misleading comments…intended to convey the impression that anything said by the defendant would not be used against him.*" Id.* at 1027-28.

Prior to these statements, Mr. Bonyhard refused to share information about driving drugs in Los Angeles, information about alien smuggling, or knowing where drugs are dropped off in Los Angeles, and expressed doubt that the officer was acting in his best interest. The interrogating agent directly contradicted Mr. Bonyhard's concerns, telling him "I don't want anything to happen to you" in order to "distort" his decision of whether to confess or remain silent. 751 F.3d at 1027.

To be sure, the Supreme Court has licensed certain forms of deception in conducting investigations. *United States v. Ramirez,* 976 F.3d 946, 952 (9th Cir. 2020) ("It has long been recognized that law enforcement may use deceit in certain circumstances."). But lies implicating an individual's right to silence and the use of his statements are different. "[W]e take a closer look when agents identify themselves as government officials but mislead suspects as to their purpose and authority," and "[t]his is because people 'should be able to rely on [the] representations' of government officials." *Id.* (citing *United States v. Bosse,* 898 F.2d 113, 115 (9th Cir. 1990) (per curiam) (internal quotation marks omitted)).

Again, it was only after these statements that Mr. Bonyhard started giving incriminating details and information. This Court must suppress his statements in the government's case-in-chief and for impeachment purposes.

//
//
//

## V. Conclusion

Mr. Bonyhard respectfully requests this Court grant his motion to suppress his statements.

Respectfully submitted,

Dated:  May 23, 2025          *s/ Jamie Elizabeth Schmid*
Jamie Elizabeth Schmid
Federal Defenders of San Diego, Inc.
Attorney for Mr. Bonyhard
Email: Jamie_Schmid @fd.org