ADAM GORDON
United States Attorney
R. AARON McELHOSE
Assistant U.S. Attorney
Washington Bar No. 44025
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-7573
Aaron.McElhose@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 25-cr-1227-BTM |
| Plaintiff, | |
| v. | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS** |
| JOHNATHAN BODINE BONYHARD, | |
| Defendant. | Date:    June 26, 2025 |
| | Time:    1:30 p.m. |

## I.    STATEMENT OF THE CASE

On February 27, 2025, a one-count Complaint was filed charging Defendant with importation of methamphetamine, in violation of 21 U.S.C. §§ 952 and 960, following his arrest on February 26, 2025 (25cr984-BTM, ECF No. 1). Defendant was later indicted and arraigned on April 29, 2025, for importing 500 grams and more of methamphetamine (25cr1227-BTM, ECF Nos. 1, 7). On May 23, 2025, Defendant filed his Motion to Suppress Statements (ECF No. 15). This response follows.

## II.     STATEMENT OF FACTS

On February 26, 2025, at approximately 2:36 AM, Johnathan Bodine BONYHARD ("BONYHARD," or "Defendant"), a United States citizen, applied for entry into the United States from Mexico through the San Ysidro Port of Entry ("POE") vehicle lanes (Complaint, 25cr984-BTM, ECF No. 1, at 2). BONYHARD was the driver, sole occupant, and registered owner of a 2019 Honda Civic bearing California license plates (*Id.*).

A Canine Enforcement Team was conducting pre-primary operations when the Human and Narcotic Detection Dog alerted to the rear bumper of the vehicle (*Id.*). The canine handler asked BONYHARD if he had any work done on the vehicle, and BONYHARD said no (*Id.*). The canine handler observed tampering and multiple non-factory oxidized bolts in the rear bumper area of the vehicle (*Id.*). A Customs and Border Protection Officer ("CBPO") assigned to the Anti-Terrorism-Contraband Enforcement Team also observed black tape in the rear bumper of the vehicle (*Id.*). Following a Customs inspection in pre-primary, BONYHARD and the vehicle were referred to secondary for further inspection. (*Id.* at 3).

Following detection of anomalies by the Z-Portal X-ray machine operator, further vehicle inspection resulted in the discovery of 109 packages concealed in the front bumper, rear bumper, rear hatch, passenger-side quarter panel, and railing of the vehicle with a total approximate weight of 69.92 kgs (153.82 lbs) (*Id.*). A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine and BONYHARD was placed under arrest at approximately 4:37 AM (*Id.*).

In support of his motion to suppress statements, BONYHARD lodged a declaration claiming certain actions occurred following his detention around 2:36 AM on February 26, 2025 (BONYHARD Declaration, ECF 15-1, at 1-2). In that declaration, BONYHARD claims he requested to CBPOs he be allowed to call his attorney on three separate occasions: (1) during the seizure and inventory of his personal belongings on his person; (2) following his placement on a bench in the security office; and (3) to the CBPO who formally placed

him under arrest, at approximately 4:37 AM (*Id.*). Further, BONYHARD asserted that during his post-*Miranda* interview, the interrogating officer told BONYHARD, "he wasn't going to provide the information I told him to anybody and that what I told him wasn't going anywhere" (*Id.* at 2). BONYHARD claims, "I took that to mean what I told him wouldn't leave the room and would stay between us" (*Id.*).

Following the filing of Defendant's motion to suppress, the government requested from the San Ysidro POE all video documenting BONYHARD in the secondary inspection area. On May 27, 2025, the POE provided several videos which depict BONYHARD in three general locations, all in the same room: 1) in a processing area while BONYHARD is patted down and his personal belongings are inventoried; and 2) further down the same room, where BONYHARD is depicted while escorted to, secured to, and removed from a metal bench; and 3) in an area of the same room, while BONYHARD is either being escorted to or from a different room, or while BONYHARD is being fingerprinted. Of those videos, only the video documenting the location where BONYHARD was patted down and his personal belongings were inventoried is accompanied by audio (Exhibit 1, Security Office Counter video).[1]

During the video, which lasts approximately 6 minutes and 38 seconds, BONYHARD is observed answering a variety of biographical questions, discussing the presence of approximately $1,000 USD in the center console, and asking the CBPOs what was found in his vehicle, all while he is patted down and his belongings inventoried (*Id.*). The video ends with him being escorted away from the processing counter (*Id.*). Nowhere in the video documenting his time in the processing area is BONYHARD observed requesting to call an attorney (*Id.*). CBPOs assigned to the security office who interacted

---

[1] There is a second video clip from this same camera that depicts BONYHARD while he is being escorted out of the security room sometime after his post-*Miranda* interview. While this video is also accompanied by audio, nothing germane to the pending motion occurs, and is therefore not included as an exhibit.

with BONYHARD were interviewed, and none recall him ever requesting an attorney (Exhibit 4).

At 6:46 AM, approximately two hours after BONYHARD was placed under arrest, Homeland Security Investigations ("HSI") Special Agent ("SA") Ian MacLean brought BONYHARD to an interview room (Exhibit 2, BONYHARD interview 1).[2] The interview was video- and audio-recorded. After informing BONYHARD that they would obtain biographical data from BONYHARD before discussing the reason why he was arrested, SA MacLean introduced himself and his partner, SA Tony Pham, with both providing their names and displaying their credentials. SA MacLean then began to obtain biographical information from BONYHARD. Among other information, agents learn that BONYHARD is a 51-year-old naturalized U.S. citizen and formerly a full-time student in paralegal studies at Southwestern College in Chula Vista, CA.[3] BONYHARD also reveals a prior history of encounters with law enforcement.[4]

Throughout the interview, the conversation is cordial in nature and tone. SA MacLean never raises his voice, nor makes any threats. BONYHARD was offered bathroom breaks and water.[5] BONYHARD's demeanor towards the interview vacillates between

---

[2] The timestamp reflected in Exhibit 2 shows the interview as starting at 6:40 AM. This timestamp appears to be approximately 5 or 6 minutes earlier than the time reflected on SA MacLean's watch. At 17:44 of the video, SA MacLean documents the time of the *Miranda* waiver as 7:03 AM, while the time reflected on the timestamp is 6:58 AM. For ease of reference, time references in the video will refer to the time elapsed on the video (e.g., 17:44 elapsed out of 1:44:45).

[3] During the gathering of biographical information, BONYHARD mentions not having a job and previously being a full-time student; later in the interview, he reveals that he had just graduated with a paralegal certificate from Southwestern College after three years of study (54:20-54:50).

[4] Specifically, when asked if he's used any other names, dates of birth, or social security numbers in the past, BONYHARD states, "well, given that I went through this thing earlier in the 2000s where me and a bunch of friends discovered the magic of identity theft, yes. But not as a means of identifying myself." Exhibit 2, 1:20-1:38. The United States incorporates in this motion by reference his complete criminal history, documented at 25cr984-BTM, ECF No. 11.

[5] See., e.g., Exhibit 2, 44:30-44:40.

4

triviality, cageyness, and concern.[6] After the gathering of biographical information, the *Miranda* rights advisement began, and the following encounter took place:

SA MacLean: "So before I talk to you about, you know, anything that happened today, I'm going to read you your rights. I'm going to give you – I'll give you a chance -- I'll give you this copy --"

BONYHARD: "Uh-huh."

SA MacLean: "-- to read through. If you can -- if you understand the rights after I've read them, I'm just going to have you initial next to it that you understand--"

BONYHARD: "Uh-huh."

SA MacLean: "-- what I've read to you, and then we'll go from there. Okay?"

BONYHARD: "Okay. I mean, I can -- I can maybe save us some time. I'm happy to initial these. I understand my rights --"

SA MacLean: "Okay."

BONYHARD: "-- way before you read them. I know you need to read them again."

SA MacLean: "Yeah."

BONYHARD: "Okay. And the other thing is, I don't really have any meaningful commentary. I would just like to know what was in my car."

SA MacLean: "Okay. Like I said, I can -- we can get into that after -- after I read this to you. So before we ask you any questions, it's my duty to advise you of your rights. You have the right to remain silent. Do you understand that?"

BONYHARD: "Uh-huh."

SA MacLean: "Okay. Just go ahead and initial there. Anything you say can be used against you in a court of law or other proceeding. Do you understand?"

---

[6] For example, during the gathering of biographical information, when asked for an address, BONYHARD responds, "I don't know. Where's the jail at?" Exhibit 2, 2:00-2:06. Later, when advised that is an additional crime to lie to a federal officer, BONYHARD responds, "Okay. I do understand that. But by way of clarification, there are things that I'm not telling you. But there's – I'm not telling you anything that isn't true. I'm just not saying some things that are." Exhibit 2, 49:10-49:36.

5

BONYHARD: "Uh-huh."

SA MacLean: "You have the right to consult an attorney before making any statement or answering any questions. Do you understand that?"

BONYHARD: "I do."

SA MacLean: "You have the right to have an attorney present with you during questioning. Do you understand that?"

BONYHARD: "Yeah."

SA MacLean: "If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish. Do you understand that?"

BONYHARD: "Uh-huh."

SA MacLean: "And then, lastly, if you decide to answer questions now, you still have the right to stop the questioning at ay time or to stop the questioning for the purpose of consulting an attorney. Do you understand that?"

BONYHARD: "Yes."

SA MacLean: "And then, finally, if you agree to this point at the bottom, I'll just need your -- I need you to read this line here."

BONYHARD: "I have read or someone has read to me a statement of my rights, and I understand what my rights are. At this time, I'm willing to answer questions without a lawyer present. If we could strike that last line, that would be great."

SA MacLean: "All right. Well, that's kind of a big --"

BONYHARD: "Yeah."

SA MacLean: "Are you --are you willing to answer questions without a lawyer present right now?"

BONYHARD: "I'm -- I mean, to a -- to a degree, yes. I mean, like --"

SA MacLean: "Like -- like -- like it says, I mean, if -- if I ask you something that you don't want to answer or you want to stop the questioning at any point, we can do that."

6

BONYHARD: "Uh-huh. I guess what I'm trying to -- what I'm trying -- what I'm trying to impress upon you is that I don't have any other than -- I -- I -- obviously I've had a minute to think about it."

SA MacLean: "Okay."

BONYHARD: "I believe -- I believe that I know what is happening."

SA MacLean: "Okay."

BONYHARD: "And I'm not -- I'm not sure how to deal with it. I mean, I don't – basically, I'm f**ked. Okay? And there's nothing I can do. And I know that because I'm not a f**kin' idiot."

SA MacLean: "Okay."

BONYHARD: "Okay? I don't know how -- what -- what I'm supposed to add to that? I mean, there's nothing to say. Like anything I say I just going to make that degree of f**kin' -- just probably worse or really not have any effect on it at all. So there's really nothing to say. I'm f**ked."

SA MacLean: "Well -- well, here's the deal. What you tell me about -- we would ask you some questions about, you know, what happened tonight, why you went down to Mexico, things like that."

BONYHARD: "Yeah."

SA MacLean: "Little things that you might not find significant might be helpful to us to figure out what happened and -- and -- and that sort of thing."

BONYHARD: "I know -- okay. I think -- I think I know who did this and when."

SA MacLean: "But before we -- listen, before we get into this --"

BONYHARD: "Yeah. Yeah. Yeah. Right. Fine. I'll -- I'll f**k myself. It's cool. Johnathan -- do you want me to sign it or print and sign?"

SA MacLean: "Print -- so if you're willing to answer questions without an attorney present, print your name and then sign and then date."

BONYHARD: "Okay."

SA MacLean: "So you're willing to talk to us without an attorney present?"

7

BONYHARD: "To a point, yeah."

SA MacLean: "Okay."

BONYHARD: "I shouldn't, but I will."

SA Pham: "Today's the 26th."

BONYHARD: "Oh, I'm sorry. Well -- sorry."

SA MacLean: "That's okay. Don't worry about it. 26th? What time is it? 07:03."

BONYHARD: "Look, there -- there -- just, also, there is a degree to which like, I mean, I wish I could be more forthcoming with you but it could be like dangerous." Exhibit 2, 13:54-18:20.

During a post-*Miranda* interview, BONYHARD denied knowledge that the narcotics were in the vehicle (Complaint, 25cr984-BTM, ECF No. 1, at 3). BONYHARD stated that he was returning home after visiting his girlfriend in Mexico and going to the casino on the evening of February 25, 2025 (*Id.*). He had crossed into Mexico from the United States around 4:00 PM on that same day, arriving at the casino between 6:30 and 7:00 PM, parking his vehicle at the front of the casino with the valet due to lack of nearby parking. BONYHARD then stated he left the casino between 10:00 and 11:00 PM, went back to his girlfriend's residence, and left to return to the United States around 2:00 AM on February 26, 2025. BONYHARD stated that an individual, whom he knows only as "Chino" or Primo," who was a friend/pseudo-relative of his girlfriend, may be responsible for the narcotics in the vehicle.[7] At approximately 1:04:44 in the interview, SA MacLean reveals that he's struggling to understand how the drugs got into the vehicle, because at no point has the car been left for a significant amount of time. BONYHARD affirms that he was in the casino for three hours, to which SA MacLean says that is not much time to take a vehicle apart and load it with that amount of narcotics (*Id.*). BONYHARD responds, "[t]hat's why my original question to you was, if you recall, what was in the car. And -- and like -- like when? Where? How much of what you are talking about? Where?" (*Id.* at 1:05:20-1:05:33). SA MacLean tells him that it was over 50 kilograms, in the front and rear of the vehicle,

---

[7] The above statements all occurred prior to 1:04:44 in the video.

and deep concealment, which, when factoring in the time to take things apart, load the narcotics, and reassemble things means there was not much time to do all that (*Id.* at 1:05:34-1:06:44). SA MacLean concludes by asking if there is another opportunity (where someone could have loaded narcotics) or something else BONYHARD is not telling him (*Id.* at 1:06:44-1:06:48). The following exchange then took place:

BONYHARD: "No. Yes, there are -- there are lots of things that I'm not telling you. I -- I mean, I don't know where to start with the things that I am not telling you."

SA MacLean: "Well, there --"

BONYHARD: "Because I don't -- I don't want things worse than this to happen to me potentially."

SA MacLean: "Well, look, laying everything out on the table would probably be the best thing at this point."

BONYHARD: "That's what I'm saying. I'm not saying like, 'No. I'm telling you everything. That's everything I know.' I have -- listen, you have a job to do and interests to protect. This is, luckily, not my job, but I have my interests to protect."

SA MacLean: "No, I understand."

BONYHARD: "I do not want to be harmed, okay, on top of all of this s**t. If I'm going to jail, I do not want to be harmed by people I don't even f**kin' know. Okay? I have my f**kin' friend's autistic kid at my f**kin' house. He's barely socialized enough to go to a job at f**kin' Vons, bro. I don't want him harmed. I don't want people coming --"

SA MacLean: "No."

BONYHARD: "I don't want people coming. I --"

SA MacLean: "I don't want that. Look --"

BONYHARD: "Okay."

SA MacLean: "-- I don't want that either."

BONYHARD: "I -- the -- okay. If -- if -- 50 kilos, okay, that's a lot of money."

SA MacLean: "Ex -- ex --"

BONYHARD: "Okay? I don't want people -- I am doing like a sort of, 'Okay. Where am I, and what is happening?' Okay. Like I don't want bad s**t to happen to me."

SA MacLean: "No. I -- I understand. And what you tell me --"

BONYHARD: "Yeah."

SA MacLean: "-- isn't going anywhere between -- other than -- as your -- you're trained as a paralegal, right?

BONYHARD: "Uh-huh."

SA MacLean: "You know I'm not going to go tell *just random* --"[8]

BONYHARD: "Nothing about my training as a paralegal -- nothing about my training as a paralegal led me to believe that investigators have some special duty to keep me safe, nothing."

SA MacLean: "Well, it's --"

BONYHARD: "I do have a special duty to keep me safe."

SA MacLean: "Right. I --"

BONYHARD: "So I'm proceeding slowly."

SA MacLean: "Look. I don't want -- I'm telling you, I don't want anything to happen to you. I'm not going to provide sensitive information to anybody. I don't want anybody getting harmed, period. Like --"

BONYHARD: "I -- I understand that. You know, listen, just please -- please take -- and, look, I'm being as straight with you as you're being with me."

SA MacLean: "Yeah."

BONYHARD: "Like I said, I am telling you true things. I am not telling you false things, right? I am not telling you all the true things." (*Id.* at 1:06:48-1:08:36).

BONYHARD continues to maintain his belief, by process of elimination, that the only person who could have done this is "Chino," as he is the only person BONYHARD

---

[8] While the government generally agrees with the defendant's facts of the colloquoy proferred in his motion during this exchange, the italicized words, uttered by SA MacLean, were absent from BONYHARD's motion.

knows who is involved in narcotics trafficking, even though he did not encounter "Chino" that day. Additionally, he questions how the drugs would have been removed from his vehicle, because it would not make sense to have people come to his apartment complex to remove the drugs after driving past a gated security entrance, although BONYHARD states that the security level to get through the gate is "zero." Further, BONYHARD asserts that he was not intoxicated, having consumed one beer the entire time he was at the casino with a cheeseburger. When asked why he's scared of being harmed, BONYHARD asserts that there's nothing specific, but with over 50 kilograms of methamphetamine that sells for $20 a quarter gram, there was a lot of value to the narcotics in his car, and people hurt people for money. When asked again if there are things relevant to the drugs being in his car right now, that were found in his car, that is his not telling SA MacLean, BONYHARD admits, "the answer to that question would be a qualified yes. Because I -- I have more knowledge of the people surrounding that whole thing than I'm telling you. Like there's people that I know that I'm not telling you about. Nobody that was there today … I have more than no idea of how this could come to pass in Playas, at that casino, in the agreed-upon amount of time. You know, like we're saying about three hours … I know how that could be done, and I want to find out whether -- basically, I need to talk to [his girlfriend]" (*Id.* at 1:23:08-1:23:50).

At approximately 8:30 AM, the initial interview between BONYHARD and SA MacLean ends and the recording is stopped. The initial interview lasted approximately 1 hour, 44 minutes, and 45 seconds. Approximately 5 to 6 minutes later, at 8:36 AM, a second video recording begins, with BONYHARD and SA MacLean in the same interview room. This second interview lasts approximately 7 minutes and 21 seconds. SA MacLean begins by attempting to remind BONYHARD that he possesses all the same rights as he was advised of previously. Exhibit 3, second interview video, at 00:13-00:17. BONYHARD cuts SA MacLean off, repeating "I know" several times. SA MacLean attempts to continue speaking, and BONYHARD states, "I'm fighting a war between my desperation to f**kin' fix everything and like my knowledge that everything I say to you guys will probably end

up f\*\*king me more. It's -- it's a battle. I really just want to --" (*Id.* at 00:24-00:40). SA MacLean responds by saying, "you mentioned you have additional -- all -- I want to make sure that you know all your rights that I explained to you before --" (*Id.* at 00:40-00:48). BONYHARD acknowledges, "yeah. They still -- they still apply" (*Id.* at 00:48-00:50). BONYHARD then goes on to describe that he knows "for a fact" that the drugs are going to one of three places – Riverside, Perris, or Buena Park, California, if this was "Chino's" people, alluding to having knowledge of specifically where, specifically who is involved, and specifically what goes on in LA County, while claiming that yesterday wasn't supposed to happen (*Id.* at 00:50-03:31). SA MacLean asks BONYHARD if someone was going to pick up the narcotics locally and drive them up, to which BONYHARD responds, "Oh, I have -- I have driven things from -- I shouldn't f\*\*kin' tell it because this is going to f\*\*k me some more. Yeah. For all the details on that s\*\*t, I need a lawyer present. I need somebody to tell me, 'Don't say that' or 'Say that." But I have lots and lots and lots of information on all that. If you want -- if you want, it would be very helpful to you or whatever law enforcement agency who was doing an investigation." (*Id.* at 03:31-04:07). SA MacLean again asks if BONYHARD wants a lawyer present, of if they can continue speaking, and BONYHARD says they can continue speaking, that he's trying to cooperate, while affirming that he is not trying to deliberately and intentionally incriminate himself when that's not even on the table [the transportation of narcotics from San Diego to three locations in Los Angeles County] (04:07-04:50). BONYHARD tells SA MacLean that he wants this to be the prelude to another conversation, and further states, "That's what I'm trying – That's what I'm trying to do, after I sleep, after I get legal counsel, and after, you know, we figure out what's helpful to who; right? I -- because I -- I need -- I either need to stop living or get out of this. Okay? Because it's going to kill my mom, dude. It's -- I mean, I need -- I'll do -- to spare her that, I would do anything. She's put so much into me, and I feel so f\*\*kin' bad, dude. I mean, I did -- I -- just let it go. But just so you know where I'm coming from." (*Id.* at 04:50-06:05). The second interview ends shortly after a recap of what BONYHARD said about his history of transporting narcotics (*Id.* at 06:05-07:21).

## III.   ARGUMENT — SUPPRESSION

*A. BONYHARD did not request to call an attorney – but even if he did, his anticipatory invocation was not valid*

"[I]n the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth [] Amendment privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980). In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "That is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Innis*, 446 U.S. at 299. "It is clear … that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Id.* "The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). "We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id*. Once "an accused has invoked his right to have counsel present during custodial interrogation … [he] is not subject to further interrogation by the authorities until counsel has been made available," unless he initiates the contact. *Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981)). "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick v.*

*Mississippi*, 498 U.S. 146, 153 (1990).

"The privilege against self-incrimination 'is an exception to the general principle that the Government has the right to everyone's testimony.'" *Salinas v. Texas*, 570 U.S. 178, 183 (quoting *Garner v. United States*, 424 U.S. 648, 658 n.11 (1976)). "[T]he 'general rule;" is "that a witness must assert the privilege to subsequently benefit from it." *Salinas*, 570 U.S. at 186 (quoting *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984)). However, the Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *Montejo*, 556 U.S. at 797 (quoting *McNeil*, 501 U.S. at 182 n.3). Rather, "[w]hat matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and … what happens during the interrogation…." *Montejo*, 556 U.S. at 797; *see, e.g., United States v. Okatan*, 728 F.3d 111, 119-20 (2d Cir. 2013) (*Miranda* prevents the introduction at trial, during the government's case in chief, of evidence that during a prearrest stop, the defendant, *in response to a question* the answer to which could have led to his criminal prosecution, stated he wanted an attorney and stopped talking).

Here, BONYHEAD claims in his declaration that he asserted his *Miranda* right to speak with an attorney on three separate occasions: (1) during the seizure and inventory of his personal belongings on his person; (2) following his placement on a bench in the security office; and (3) to the CBPO who formally placed him under arrest, at approximately 4:37 AM. There is reason to doubt the truthfulness of BONYHARD's assertions that he requested to call an attorney during these occasions – while audio of the interactions does not exist for each occasion he claims to have requested to call his attorney, audio *does* exist for the first occasion, when he was being patted down and his personal belongings were being inventoried (see Exhibit 1). There is no mention of an attorney during this interaction, much less a request to call an attorney. None of these alleged requests to call his attorney, if they occurred, were during custodial interrogation or questioning. Even if BONYHARD had requested to call his attorney during these occasions (two of which were while he was in a detained, non-custodial status), they would be the

14

type of anticipatory invocations that the Supreme Court has never held can be done outside the context of a custodial interrogation. When BONYHARD was advised of his *Miranda* rights during the custodial interrogation, he agreed to speak with SA MacLean, waiving those rights. For these reasons,

> B. BONYHEAD did not invoke his Miranda *rights; if he did so, it was ambiguous*

"*Miranda* did not hold, however, that th[e] rights [to remain silent and to have an attorney present] could not be waived." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991). "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444; *see, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *McNeil*, 501 U.S. at 176; *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Edwards*, 451 U.S. at 482. In order to conclude that there has been a waiver, the court must find – by a preponderance of the evidence, *see, e.g., Colorado v. Connelly*, 479 U.S. 157, 168 (1986) – first, that "the relinquishment of the right" was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, that it was made with "the requisite level of comprehension," *i.e.*, "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Moran*, 475 U.S. at 421. In determining whether or not the relinquishment of the right was voluntary, knowing, and intelligent, the court must consider "the totality of the circumstances surrounding the interrogation." *Id.* (internal quotation marks omitted). "A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." *Davis*, 512 U.S. at 460-461.

When a suspect subject to custodial interrogation invokes the right to remain silent or to an attorney, substantive questioning must cease. But before the rule applies, a court "must determine whether the accused actually invoked" his rights. *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (*per curiam*). That is because the *Miranda* rights to silence and counsel are not "self-executing" and so "a witness who desires its protection 'must claim it.'"

*Salinas*, 570 U.S. at 181 (quoting *Murphy*, 465 U.S. at 425, 427). In this context, invocations of the right to silence and right to counsel are treated the same, as "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel[.]" *Berghuis*, 560 U.S. at 581.

Though no specific language is needed to invoke one's rights, the demand must be made "unambiguously" and without equivocation. *Id.* "If the statement fails to meet the requisite level of clarity" – that is, if the "suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" – precedent "does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459 ("Maybe I should talk to a lawyer" was not a request for counsel).

The *Miranda* rights advisement began approximately 14 minutes after initiation of the interview, following completion of gathering of biographical information. BONYHARD's demeanor and responses throughout those preceding 14 minutes reflected a treatment of the interview as a casual triviality – he is observed making jokes when asked basic biographical questions (*see, e.g.,* footnote 6, *supra*), and shortly after the rights advisement begins, he tries to rush SA MacLean through his recitation of rights ("Okay. I mean, I can -- I can maybe save us some time. I'm happy to initial these. I understand my rights … way before you read them. I know you need to read them again.").

With this backdrop in mind, BONYHARD's statement, "If we could strike that last line, that would be great" was, at best, an ambiguous invocation of his *Miranda* right to counsel. Seeking clarification, as SA MacLean did, is precisely what the Ninth Circuit and others have repeatedly encouraged (but not required) agents to do when a suspect gives ambiguous responses. *See, e.g., Davis*, 512 U.S. at 461 ("[W]hen a suspect make an ambiguous or equivocal statement it will often be good police practices for the interviewing officers to clarify whether or not he actually wants an attorney. … But we decline to adopt a rule requiring officers to ask clarifying questions."); *Berghuis*, 560 U.S. at 381; *Medina*

16

*v. Singletary*, 59 F.3d 1095, 1105 (11th Cir. 1995) (holding that when defendant said "no" he did not wish to speak, detective's single clarifying questions: 'You don't want to talk to us or you do want to talk to us?'" was proper clarification and permitted additional interrogation); *see also People v. Allen*, 650 N.E.2d 250 (Ill. App. Ct. 1995) (unpublished) (when asked "Understanding these rights, do you wish to talk to us now?" defendant responded "No." When asked, "You don't want to talk?" defendant responded, "Yes, I will talk." This was held to be proper, as the follow-on question merely ensured the defendant understood the question).

Further, a defendant may selectively waive his *Miranda* rights, deciding "to respond to some questions but not others." *Bruni v. Lewis*, 847 F.2d 561, 563 (9th Cir. 1988) (determining that defendant both unambiguously invoked his right to counsel and unequivocally waived his right to counsel when he stated "Not without my attorney," then added, "Well, ask your questions and I will answer those I see fit.") (quoting *United States v. Thierman*, 678 F.2d 1331, 1335 (9th Cir. 1982). BONYHARD's willingness to answer questions "to a degree" reflected an understanding by him that he *was* willing to answer some questions, but not others (and he exercised that right). Like the defendant in *Bruni*, BONYHARD had prior felony arrests and so probably felt sufficiently familiar with arrest procedures to respond to questions that he wanted to answer or that he believed his attorney would allow him to answer. *Id*. at 564. Similarly, references to an attorney during the subsequent interrogation of BONYHARD did not reflect an attempt to invoke a *present* right to counsel. *Id*. (citing *United States v. Jardina*, 747 F.2d 945, 949 (5th Cir. 1984). While BONYHARD does reference an attorney at certain parts of his interrogation, the mere mentioning of an attorney does not suffice to render those statements an equivocal request for counsel. *Id.* (citing *Jardina*) (noting that "[t]he word 'attorney' has no talismanic qualities"). Even when BONYHARD referenced an attorney, SA MacLean proceeded carefully, each time seeking clarification whether BONYHARD desired counsel present. Each time, BONYHARD declined to unequivocally invoke his right to counsel, and indicated his willingness to continue answering questions.

17

In addition, the Supreme Court has emphasized that ending interrogations based on "an ambiguous act, omission, or statement," as here, would require agents "to make difficult decisions about an accused's unclear intent and face the consequences of suppression "if they guess wrong," resulting in "a significant burden on society's interest in prosecuting criminal activity." *Berghuis*, 560 U.S. at 382. Thus, though "[t]reating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights 'might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation,'" a requirement for inambiguous invocation is appropriate to protect both a defendant's rights and society's interest in crime control. *Id*. (quoting *Moran*, 475 U.S. at 425). SA MacLean did not plow ahead based on ambiguity, but instead repeatedly tried to clarify what BONYHARD wanted to do. Punishing that by suppressing statements does not advance *Miranda's* goal.

When courts find invocation, it is with significantly clearer language than here. For example: "I plead the Fifth." *Anderson v. Terhune*, 516 F.3d 781, 784 (9th Cir. 2008) (*en banc*); "I don't want to talk no more." *Jones v. Harrington*, 829 F.3d 1128, 1140 (9th Cir. 2016); "[D]o you wish to talk to me?" "No." *Garcia v. Long*, 808 F.3d 771, 774 (9th Cir. 2015); "I have decided not to say any more." *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cit. 2011); Not "going to say anything at all." *United States v. Abdallah*, 911 F.3d 201, 214 (4th Cir. 2018); "I'm done talking." *Flores v. Muniz*, 809 F. App'x 463, 464 (9th Cir. 2020) (unpublished); "I have nothing to say." *United States v. Proano*, 715 F. App'x 655, 656 (9th Cir. 2018) (unpublished); "I ain't got nothing to say." *United States v. Morales*, 2020 WL 7226439, at *2 (S.D. Cal. Dec. 8, 2020). These statements, held to be unambiguous invocations, are all much more direct and definitive than BONYHARD's "If we could just strike that last line, that would be great."

BONYHARD's statement is instead closer to the following comments, all of which were held to be ambiguous and thus not invocations: "What else can I say?" *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007); "I'm good for tonight." *United States v. Rodriguez*, 518 F.3d 1072, 1077 (9th Cir. 2008); "I just don't think that I should say

18

anything." *Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000); "I'm not going to talk about nothin'." *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006); "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 462; "I guess I'll wait until an attorney's present or something." *Lopez v. Janda*, 742 F. App'x 211, 213 (9th Cir. 2018) (unpublished); "I don't even like talking about it man … I don't even want to, you know what I'm saying, discuss no more about it, man." *State v. Jackson*, 839 N.E.2d 362, 373 (Ohio 2006).

### C. SA MacLean did not promise BONYHARD complete confidentiality, and evidence supports that BONYHARD did not perceive the comment that way

"Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence." *United States v. Leon-Guerrero*, 847 F.2d 1363, 1364 (9th Cir. 1988) (citing *Lego v. Twomey*, 404 U.S. 477 ,489 (1972)).[9] Both physical and psychological pressure can lead to involuntary confessions. *United States v. Miller*, 984 F.3d 1028, 1030 (9th Cir. 1993) (citing *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)). While a confession accompanied by physical violence is *per se* involuntary, psychological coercion provokes no *per se* rule. *Id*. (internal citations omitted). The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *Id*. (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)); *see also Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973) (compiling cases) ("In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted"); *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Dickerson v. United States*, 530 U.S. 428, 434 (2000). The pivotal question in each case is whether the defendant's will was overborne when the defendant confessed. *Id*. (citing *Schneckloth*, 412 U.S. at 225-26; *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981). Deception does not automatically render a confession involuntary. *Id*. at 1031 (citing

---

[9] See also discussion at § III.B, *supra*.

*Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969)). "[A]s long as th[e] decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Id*.

As the totality of circumstances test of voluntariness is necessarily fact-driven, federal and state case law is littered with examples of promises of confidentiality that both rendered a statement involuntary and those that did not. For example, in *People v. Mathis*, 252 N.E.3d 870 (Ill. App. Ct. 2024), the confession of a schizophrenic defendant with an IQ of 70 was found to have been involuntary when the detectives conducting the interrogation told him, "Whatever, it's between him, you and me" (referring to the two detectives and defendant in the interrogation room) and "nobody else will know what the three of us are talking about" and the defendant subsequently confessed. Conversely, an appellate court in the same State determined in *People v. Leanos*, 236 N.E.3d 559 (Ill. App. Ct. 2023) that assurances to an 18-year-old defendant that "What you tell us is stayin' in here," and "What you say here, stays here with us right now" were "blanket promises of confidentiality" that could have been reasonably understood as being held in confidentiality by the police and not used against him in a criminal proceeding, but that suppression was not warranted, as these assurances were far attenuated from the defendant's confession and not remotely responsible for it.[10] Similarly, the United States Court of Appeals for the Fifth Circuit determined a confession to be involuntary when the defendant was held in isolation for fifteen days and subjected to eight interrogations by law enforcement officers (none of which resulted in a confession), when the State called in a detective from another state whom the defendant considered an old friend. *Hopkins v. Cockrell*, 325 F.3d 579, 581 (5th Cir. 2003). During the four-hour conversation, that "friend" detective made repeated references to the talk "[I]s for me and you. This is for me. Okay. This ain't for nobody else." *Id*. at 581, 584. The totality of the circumstances was determined to render defendant's

---

[10] The defendant in *Leanos* was subjected to four successive rounds of interrogation, with brief breaks in between. His confession occurred about 3.5 hours after the start of interrogation, during the fourth round of interrogation. The "blanket promise of confidentiality" occurred during the second round of interrogation.

confession involuntary.[11] Conversely, in *United States v. Collado-Rivera*, 759 Fed.App'x. 455 (6th Cir. 2019), the Court of Appeals determined that a well-educated, fluent English-speaking defendant who confessed approximately an hour and a half after he was mistreated during a violent search warrant execution, and was allegedly told, "Don't worry because everything will be confidential. Nobody gonna know," did not render his confession involuntary, as the mistreatment of defendant during the execution of the search warrant did not transform the later, post-*Miranda* interview into a coercive environment and that any alleged promise of confidentiality did not overbear defendant's will or serve as the crucial motivating factor for his statements.[12]

Here, the totality of circumstances surrounding the "promise" countenance a finding that the promise did not overbear BONYHARD's will, nor were his statements involuntary. First, while this was in the context of a post-*Miranda* waiver during a custodial

[11] These facts are similar in nature to *United States v. Walton*, 10 F.3d 1074 (3d Cir. 1993), both cited to in BONYHARD's motion. In *Walton*, the defendant asked to talk to agents off the record, in a non-custodial setting. *Id.* at 1027. One of those agents had grown up with the defendant, and they had wrestled together at the same high school. *Id.* Early in the un *Mirandized* conversation, the agent said, I've known you for a long time. If you want, you can tell us what happened off the cuff." *Id.* The agents later testified that they meant to say the statements would not be used against the defendant. *Id.* Although the trial court did not make a finding that the defendant believed the agent's promise, the Court of Appeals determined this was a promise of confidentiality that the defendant had no reason not to believe, and found the statement therefore involuntary. *Id.* at 1029.

[12] See also *United States v. Pace*, 898 F.2d 1218, 1246 (7th Cir. 1990) (defendant fully understood *Miranda* warnings provided, and since he was aware that his statements could be used against him, it was not clear error to find that no promises of confidentiality or non-use were made, or that any such promises did not induce defendant's statements); *United States v. Santacruz*, 2022 WL 4554420 (N.D. Ga. 2022) (unpublished) (post-*Miranda*, defendant promised by agents that his statements would "stay here" and would not be "leaked;" Court determined that under totality of circumstances, including defendant's exhibition of knowledge and some command of the criminal investigation process (including suggestions that he would consider acting as a cooperating witness or confidential informant) and the context of the agent's assurances made it clear that the promise of confidentiality was referencing that his statements would be kept secret from others in his organization or those who might inform them. Thus, the promise did not render his confession involuntary, and the promise did not induce him to talk.

interrogation, the characteristics of the suspect reveal that he is an educated 50-year-old who was not intoxicated, albeit perhaps tired from a long day ,with no known intellectual deficits; indeed, he reveals during the interview that he has recently completed his studies to earn a paralegal certificate, graduating "with honors." Further, he demonstrates throughout the interview a command of his understanding of the criminal investigative process – both in his prior contacts with law enforcement and the criminal justice process, his knowledge learned through his studies, and his conversations where he exercised his rights with SA MacLean (e.g., refusing to grant consent to search his cell phone, and refusing to answer certain questions about events he had knowledge of).

Perhaps more important in determining that the "promise" did not overbear his will is the context surrounding the discussion. BONYHARD expressed a concern that information from his conversation with SA MacLean would make lead to him or others being harmed (he later clarified that this harm was a general concern for his safety, not a specific threat of harm, and others, as the amount of narcotics in his vehicle was a significant amount, worth a lot of money, and people hurt others for money). SA MacLean's promise that the information would not be released to some random person is directly in response to BONYHARD's concerns that his statements would leak out. And factually speaking, SA MacLean's assertions were true – while he did not complete the statement, it was clear that SA MacLean was telling BONYHARD that what BONYHARD said to SA MacLean would not be divulged to anyone other than those involved in the case (e.g., the attorneys), and they certainly would not be divulged to random people.

Critically, we know from the context of the interrogation that, despite what BONYHARD claims in paragraph 10 of his declaration, BONYHARD took SA MacLean's comment to mean that his statements would not be released to the general public and some random people, but that instead his statements *would* be used against him. Beyond the obvious rights advisement informing BONYHARD of that, which BONYHARD demonstrated clear knowledge of, BONYHARD's statements throughout the interrogation reflect that understanding. For example, well after the alleged "promise," and after he has

been reminded that his *Miranda* rights still apply, BONYHARD states, "I'm fighting a war between my desperation to f\*\*kin' fix everything and like *my knowledge that everything I say to you guys will probably end up f\*\*king me more*. It's -- it's a battle. I really just want to --" (Exhibit 3, at 00:24-00:40). During that same second interview, when SA MacLean asks BONYHARD if someone was going to pick up the narcotics locally and drive them up, BONYHARD responds, "Oh, I have -- I have driven things from -- *I shouldn't f\*\*\*in' tell it because this is going to f\*\*k me some more*." (*Id.* at 03:31-04:07). He goes on to say, "I have lots and lots and lots of information on all that. If you want -- if you want, *it would be very helpful to you or whatever law enforcement agency who was doing an investigation*." *Id.* He repeats that what he's trying to do is have this conversation be a prelude to another conversation, and he wants to do that and figure out what's helpful to who (*Id.* at 04:50-06:05). Finally, he even makes reference to his mother, saying this is going to "kill her," acknowledging that his prosecution for importing narcotics will happen, and not that his statements will be kept inside the four corners of the interrogation room.

Ninth Circuit opinions regarding promises of confidentiality are limited, but distinguishable on the facts that determine the totality of the circumstances. In *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014), the Court concluded that a confession was involuntarily given by an intellectually disabled eighteen-year-old, where the police, among other tactics, repeatedly presented the defendant with the choice of confessing to a heinous crime or to a less heinous crime; rejected his denials of guilt; instructed him on the responses they would accept; fed him the details of the crime to which they wanted him to confess; and also promised the defendant they would not tell this to anybody, and his statement would not leave the U.S. Attorney's file.[13] In *Henry v. Kernan*, 197 F.3d 1021 (9th Cir.

---

[13] Notably, although the Court evaluated the totality of the circumstances to determine the confession was involuntary, their evaluation of the law enforcement tactics were in conjunction with the defendant's serious intellectual disability, as "What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal." *Id.*, at 1016-1017 (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)).

1999), the defendant, when he was advised of his *Miranda* rights, responded by asking if he could have his lawyer there, then said he should probably have a lawyer, and finally confirmed he wanted an attorney. Despite his invocation, and with the express purpose of deliberately violating defendant's *Miranda* rights, the officers proceeded to interrogate him. Later, when the defendant inquired where his was "supposed to keep talking without an attorney," the detective interrupted him to state, "Listen, what you tell us we can't use against you right now … We'd just would like to know." *Id.* at 1027, 1029. By ignoring his request for counsel, and continuing questioning as if no question had been made, then promising that his statements could not be used against him, the Court determined that his will was overborne and his statements involuntary. The hallmark of each of these cases, distinguishing them from the facts in BONYHARD, is that law enforcement officers either used a number of coercive police tactics, in addition to a promise of confidentiality, on a vulnerable and intellectually disabled teenager (*Preston*), or deliberately ignored the defendant's unambiguous invocation of his rights (and, unlike here, did not seek clarification), continued to interrogate the suspect, and then unequivocally promised the defendant that his statements could not be used against him. The facts here are clearly different.

The Supreme Court and Ninth Circuit have rejected arguments of involuntary confessions with far more compelling facts than BONYHARD offers. *See, e.g., United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002) (confession voluntary where defendant was held for 31 hours and fed once); *United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) (en banc) (holding that an inspector's misrepresentation that a piece of evidence existed, while reprehensible, does not constitute coercive conduct); *Blanco v. Mukasey*, 518 F.3d 714, 721 (9th Cir. 2008) (suspect's will not overborne even though he was detained twenty-six hours before his interview and given only bologna and cheese to eat); *United States v. Male Juvenile*, 280 F.3d 1008, 1022-23 (9th Cir. 2002) (14-year old's confession voluntary, despite his misunderstanding that his statements could be used because investigators did not misrepresent his rights and there was no evidence of coercion).

Thus, considering the totality of the circumstances, the "promise" made by SA MacLean is not the type of psychological coercion, deception, or improper inducement that would cause BONYHARD's will to be overborne. To the contrary, SA MacLean's statements were factually accurate assurances that statements made by BONYHARD would not be shared with random people that might lead to someone's harm. BONYHARD's statements throughout the post-"promise" interviews make it clear that he knew his voluntary statements would be used against him. Accordingly, his statements should be deemed voluntary, and not subject to suppression.[14]

## IV.   **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court DENY Defendant's Motions to Suppress Statements.

DATE: June 12, 2025

Respectfully submitted,

ADAM GORDON
United States Attorney

*/s/ R. Aaron McElhose*
R. AARON McELHOSE
Assistant United States Attorney

---

[14] If this Court determines that "If we could strike that last line, that would be great," was an unequivocal invocation of BONYHARD's *Miranda* right to counsel, then his subsequent statements would be suppressed for use by the government in its case-in-chief. However, a voluntariness analysis, under the totality of the circumstances, should still be utilized to determine whether the statements were obtained in a manner "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *see also Dickerson*, 530 U.S. at 434 (applying the totality of circumstances test to determine whether a defendant's will was overborne to render a statement involuntary in violation of due process). Here, that analysis leads to the same conclusion discussed in § III.C. *supra* – that BONYHARD's statements were voluntary, and thus could be used for impeachment.